UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

WEEKS MARINE, INC.,

                Plaintiff,

      - against -

AMERICAN STEAMSHIP OWNERS MUTUAL
PROTECTION AND INDEMNITY
ASSOCIATION, INC., and SHIPOWNERS
CLAIMS BUREAU, INC.,
as manager of American Steamship,

                Defendants.
----------------------------------X

**MEMORANDUM AND ORDER**

08 Civ. 9878 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


      Plaintiff Weeks Marine, Inc. ("plaintiff" or "Weeks Marine") brought this action against defendants American Steamship Owners Mutual Protection and Indemnity Association, Inc. (the "American Club") and Shipowners Claims Bureau, Inc. ("SCB") (collectively, "defendants"), seeking a declaration that it complied with the terms of its insurance contract with the defendants, and an award of damages for the defendants' alleged breach of the contract. Presently before the court is defendants' motion for summary judgment. For the reasons set forth below, the motion is granted.

**BACKGROUND**

I.    **Factual Background**[1]

  A. **The Parties**

     The American Club is a non-profit mutual insurance association whose daily activities are conducted by its manager, SCB.  Defs.' 56.1 at ¶¶ 1-2.  It provides protection and indemnity insurance ("P&I Insurance") for shipowners and charterers.  Moore Aff. at ¶ 3.  Weeks Marine is a corporation involved in commercial marine contracting, including dredging operations.  Langan Decl. at ¶ 3.

  B. **Weeks Marine's Membership in The American Club**

     Weeks Marine first became a member of the American Club on March 31, 2002.  Moore Aff. at ¶ 4.  Membership in the American Club is evidenced by a document called a "Certificate of Entry."  Defs.' 56.1 at ¶ 3.    On or about April 1, 2005, The American Club issued Weeks Marine a Certificate of Entry to commence on February 20, 2005 and with a renewal date of February 20, 2006.  Moore  Aff. at ¶ 4.  This Certificate of Entry covered the time period relevant to this case.

  C. **Weeks Marine's 2005-2006 Certificate of Entry**

---

[1] The following facts are drawn from the Defendants' American Steamship Owners Mutual Protection and Indemnity Association, Inc. and Shipowners Claims Bureau, Inc.'s Local Civil Rule 56.1 Statement ("Defs.' 56.1"); Plaintiff's Local Rule 56.1(b) Counter-Statement of Facts ("Pl.'s 56.1"); the Affidavit of Donald R. Moore ("Moore Aff."); and the Declaration of Thomas F. Langan, ("Langan Decl.").  Unless otherwise noted, the facts recited herein are not subject to material dispute.

Weeks Marine's 2005-2006 Certificate of Entry provided a coverage limit of $3 million for liability for claims by crew or employees, subject to a self-insured deductible of $1 million. Thus, under the terms of the Certificate of Entry, Weeks Marine was responsible for $1 million of liability resulting from claims by crew or employees, and the American Club was responsible for a maximum of $2 million. <u>Id.</u> at ¶ 7; Pl.'s 56.1 at ¶ 7.

Weeks Marine's Certificate of Entry included a "Crew Claims Procedure," which provided:

> It is noted and agreed that Crew Claims Procedure reads as follows with effect from inception:
>
> The Insured shall be responsible for the investigation, settlement, defense or appeal of any claim made or suit brought, or proceeding instituted against the Insured and shall give prompt notice to Shipowners Claims Bureau, upon the Insured's Risk Management department being notified of any of the following:
>
> (a) any claim, suit or proceeding that appears to involve indemnity by the American Club;
>
> (b) any occurrence, claim, award or proceeding judgment which exceeds 50% of the Insured's retention under this policy;
>
> (c) any occurrence which causes serious injury (disability for a period of nine months or more) to two or more employees;
>
> (d) any case involving: 1. Amputation of a major extremity, 2. Brain or spinal cord injury, 3. Death, 4. Any second or third degree burn of 50% of the body or more;

(e) the reopening of any case in which further award might involve liability to the American Club.

Defs.' 56.1 at ¶ 9.

The Certificate of Entry (as well as the American Club's By-Laws) was governed by New York law. See Moore Aff., Ex. 1 (the "By-Laws") at 37 ("These Rules and any contract of insurance between the Association and a Member shall be governed by and construed in accordance with the law of the State of New York.").

**D. The Garza Claim**

The present dispute results from an injury suffered on February 15, 2006 by one of Weeks Marine's crew members, Maximino Garza ("Garza"), after he was struck by a lever in his head, while wearing a hardhat. See id. at ¶ 9; Pl.'s 56.1 at ¶ 9. After the accident, Garza went to Montet's Occupational Medical Service and was diagnosed with a concussion and a cervical sprain. Defs.' 56.1 at ¶ 10.[2] Garza returned to work after the incident, and continued working until April 26, 2006, the date on which his regularly scheduled rotation ended. Langan Decl. at ¶¶ 9, 12. Garza was supposed to return to work on May 4, 2006 but did not show up or contact Weeks Marine to explain his absence. Id. at ¶ 12. He was fired two weeks later, on May 17, 2006. Id.

---

[2] While plaintiff admits that Garza was "clinically diagnosed with a mild concussion and cervical sprain," it contends that "[t]he evidence cited by the [d]efendants does not support its contention." Pl.'s 56.1 at ¶ 11.

On the same day that he was fired, Garza filed a lawsuit against Weeks Marine in the 381st Judicial District Court of Starr County, Texas. Id. at ¶ 12. In January of 2008, after discovery had ended and on the eve of trial, Garza made a settlement demand of $850,000. See Moore Aff., Ex. 4 at CLUB 000160. Weeks Marine offered $200,000, and provided its counsel with the authority to offer up to $300,000 to settle the case in full. Id.

On February 5, 2008, the state court entered a judgment in favor of Garza for $3,715,620.36. Pl.'s 56.1 at ¶ 13. Two days later -- after the American Club called Weeks Marine to ask about a verdict against Weeks Marine in Starr County (i.e. the Garza verdict) that it had heard about (Moore Aff. at ¶ 7) -- the American Club received notice of Garza's injuries and lawsuit for the first time. Defs.' 56.1 at ¶ 14. Weeks Marine appealed the verdict in the Garza litigation, but it was affirmed by the Texas Court of Appeals. Langan Decl. at ¶ 18.

**E. The Parties' Claims**

Defendants argue that plaintiff "breached the requirement of prompt notice in the Crew Claims Procedure by failing to provide notice of Mr. Garza's claim involving a brain injury to the American Club for almost two years." Defs.' 56.1 at ¶ 15. Thus, they contend, plaintiff is not entitled to indemnification with respect to the Garza claim.

Plaintiff presents a number of arguments in opposition to defendants' motion. First, it contends that its compliance with the Crew Claims Procedure clause in its Certificate of Entry is not a condition precedent to coverage for the Garza claim. Second, it contends that, even if compliance is a condition precedent to coverage, defendants must show that they were prejudiced by plaintiff's alleged breach of the contract. Third, it argues that Garza's concussion was not a "brain or spinal cord injury" under the terms of the contract, and that the term "brain injury" is ambiguous. And fourth, plaintiff argues that there is a question of fact as to whether defendants are estopped from denying coverage for the Garza claim on the grounds that Weeks Marine provided late notice.

## II.  Procedural History

This case was reassigned from Judge Lynch's docket to this Court's docket on October 1, 2009. On November 5, 2010, the defendants filed their motion for summary judgment. Plaintiff filed its opposition brief on December 3, 2010, and defendants filed their reply brief on December 17, 2010. Oral argument was held on August 9, 2011.

## DISCUSSION

## I.  Legal Standard for Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)); see also Quarles v. Gen. Motors Corp., 758 F.2d 839, 840 (2d Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.

On a motion for summary judgment, the initial burden rests with the moving party to make a prima facie showing that no material fact issues exist for trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 330-31 (1986). Once this showing is made, "[t]o defeat summary judgment, the non-movant must produce specific facts" to rebut the movant's showing and to establish that there are material issues of fact requiring trial. Wright v. Coughlin, 132 F.3d 133, 137 (2d Cir. 1998) (citing Celotex, 477 U.S. at 322). In determining whether a genuine issue of material fact exists, a court must view the facts in the light most favorable to the non-moving party and make all reasonable inferences in that party's favor. See Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 720 (2d Cir. 2010).

## II.  Analysis

### A. New York's "No Prejudice" Rule

"Prior to recent legislative amendments to New York's insurance law . . . the longstanding rule in New York held that where a primary insurance contract requires the insured to provide prompt notice after an occurrence potentially giving rise to liability, 'the absence of timely notice of an occurrence is a failure to comply with a condition precedent which, as a matter of law, vitiates the contract.'" Pactrans Air & Seas, Inc. v. New York Marine and General Ins. Co., 387 Fed. Appx. 43, 45 (2d Cir. 2010).  Thus, a primary insurer did not have to "show prejudice before it [could] assert the defense of noncompliance."  Sec. Mut. Ins. Co. v. Acker-Fitzsimons Corp., 31 N.Y.2d 436, 440, 293 N.E.2d 76, 78, 340 N.Y.S.2d 902, 905(1972).  The "no prejudice" rule in the insurance context was designed as an exception to the traditional rule of contract interpretation that "a contractual duty [requiring strict compliance] ordinarily will not be construed as a condition precedent absent clear language showing that the parties intended to make it a condition."  Rekemeyer v. State Farm Mut. Auto Ins., 4 N.Y.3d 468, 475, 828 N.E.2d 970, 796 N.Y.S.2d 13 (2005) (quoting Unigard Sec. Ins. Co. v. North River Ins. Co.,

79 NY2d 576, 581, 594 N.E.2d 571, 584 N.Y.S.2d 290 (1992)(citations omitted)).

In 2010, the New York Legislature abandoned its "no prejudice" rule and enacted a new scheme under which late notice does not invalidate an insured's claim unless (1) an insurer proves prejudice where notice was provided within two years, or (2) an insured fails to prove lack of prejudice where notice was provided after two years. See N.Y. Ins. Law §§ 3420(a)(5), 3420(c)(2)(A). Even under the recent amendments, however, an "irrebuttable presumption of prejudice" applies if, prior to notice, "the insured's liability has been determined by a court of competent jurisdiction or by binding arbitration; or if the insured has resolved the claim or suit by settlement or other compromise." N.Y. Ins. Law. § 3420(c)(2)(B).

While Weeks Marine cites to these recent legislative amendments, the amendments do not apply to insurance policies issued and delivered before January 17, 2009. See Pactrans Air, 387 Fed. Appx. at 47 n.2. In addition, as the Second Circuit noted, "[i]t appears that maritime insurance contracts are, and have been for decades, excluded from this section of New York insurance law." Id. (citing N.Y. Ins. Law. § 3420(i) (cross-referencing N.Y. Ins. Law. § 2117(b)(3))). Thus, because the contract at issue in this case was issued and delivered before January 17, 2009, and because it is a maritime insurance

contract, we must analyze it under New York's pre-amendment "no prejudice" standard.

**B. Exceptions to the "No-Prejudice" Rule**

Weeks Marine contends that the Crew Claims Procedure is "not a notice of claim provision, but rather a uniquely drafted reporting provision that confers rights upon Weeks Marine typically reserved to a primary liability insurer — such as the right to defend, investigate, settle, and appeal claims." Weeks Marine's Mem. of Law. in Opp'n to the Defs.' Mot. for Summ. J. ("Pl.'s Mem.") at 9 (emphasis in original).   Thus, Weeks Marine argues, under the terms of the Crew Claims Procedure, the American Club is effectively a reinsurer, not a primary insurer. See id. at 9-13.   This distinction is significant because in Unigard Sec. Ins. Co. v. North River Ins. Co., 79 N.Y.2d 576, 594 N.E.2d 571, 584 N.Y.S.2d 290 (1992), the New York Court of Appeals held that the "no prejudice" rule does not apply to reinsurers.

Because Weeks Marine contends that the Certificate of Entry should be analyzed under the Unigard rule, we begin by summarizing the Court of Appeals' decision in that case.   We then consider the Court of Appeals' decision in American Home Assurance Co. v. International Insurance Co., 90 N.Y.2d 433, 684 N.E.2d 14, 661 N.Y.S.2d 584 (1997), which held that the Unigard rule does not apply to excess insurers.   After setting forth

this background, we consider Weeks Marine's claim that the American Club should be required to show prejudice.

### 1. **Unigard** and **American Home**

In reaching its conclusion that the "no prejudice" rule does not apply in the reinsurance context, the Court of Appeals in Unigard first summarized the reasons for applying the "no prejudice" rule in the primary insurance context. They included:

- "[T]he insurer [must have] an opportunity to protect itself." Unigard, 79 N.Y.2d at 581, 594 N.E.2d at 573, 584 N.Y.S.2d at 292 (quoting Sec. Mut. Ins. Co. v. Acker-Fitzsimons Corp., 31 N.Y.2d at 440, 340 N.Y.S.2d at 902, 293 N.E.2d at 76 (1972)).

- "[W]ithout timely notice, 'an insurer may be deprived of the opportunity to investigate a claim and is rendered vulnerable to fraud.'" Id. (quoting Power Auth. v. Westinghouse Elec. Corp., 117 A.D.2d 336, 339, 502 N.Y.S.2d 420, 422 (1st Dep't 1986)).

- "[L]ate 'notification may . . . prevent the insurer from providing a sufficient reserve fund.'" Id., 79 N.Y.2d at at 581-82, 594 N.E.2d at 573, 584 N.Y.S.2d at 292 (quoting Power Auth., 117 A.D.2d at 339, 502 N.Y.S. at 422).

- "Prompt notice permits the primary insurer to make an early estimate of potential exposure, to investigate the claim while witnesses and facts are available, and to take steps to prevent fraud." Id., 79 N.Y.2d at 582, 594 N.E.2d at 573, 584 N.Y.S.2d at 292 (citation omitted).

- "Early notice enables the insurer, inter alia, to exercise early control over the claim and enhances the possibility of settlement." Id. (citation omitted).

The Court then considered whether the same reasons for implementing a "no prejudice" rule in the primary insurer

context apply in the reinsurance context.  It found that they do
not, and that the "differences in the contractual undertakings
of reinsurers and primary insurers have consequences of critical
importance."   Id., 79 N.Y.2d at 583, 594 N.E.2d at 574, 584
N.Y.S.2d at 293.

The Court began by defining reinsurance:

> A certificate of reinsurance -- unlike a contract of
> primary insurance -- is not a contract under which the
> company agrees to indemnify the insured from losses up
> to a stated limit upon the happening of specified
> contingencies.  A certificate of reinsurance is a
> contract between two insurance companies in which the
> reinsured company agrees to cede part of its risk to
> the reinsurer in return for a percentage of the
> premium.  A reinsurance contract operates solely
> between the reinsurer and the ceding company.  It
> confers no rights on the insured. . . . [A]
> reinsurer's only obligation is to indemnify the
> primary insurer.

Id., 79 N.Y.2d at 583, 594 N.E.2d at 573, 584 N.Y.S.2d at 292
(internal quotation marks and citation omitted).  The Court then
listed the following additional differences between primary
insurers and reinsurers that, it found, lead to the conclusion
that the "no prejudice" rule does not apply in the reinsurance
context:

- "A reinsurer is not responsible for providing a defense,
  for investigating the claim or for attempting to get
  control of the claim in order to effect an early
  settlement."  Id., 79 N.Y.2d at 583, 594 N.E.2d at 574, 584
  N.Y.S.2d at 293.

- "Unlike a primary insurer, it may not be held liable to the
  insured for a breach of these duties."  Id.

- "Settlements, as well as the investigation and defense of claims are the sole responsibility of the primary insurer; and settlements made by the primary insurer are, by express terms of the reinsurance certificate, binding on the reinsurer. <u>Id.</u>

- "[T]he interests of a reinsurer and the ceding primary insurer with respect to a pending claim are generally identical. The 'follow the fortunes' clause in most reinsurance agreements leaves reinsurers little room to dispute the reinsured's conduct of the case. In addition, the interests of both parties are furthered through the primary insurer's efficient investigation and defense of the claim and through the resolution of the claim on the best terms possible. . . . By contrast, the interests of a primary insurer and its insured may often be adverse." <u>Id.</u>

In <u>American Home</u>, 90 N.Y.2d 433, 684 N.E.2d 14, 661 N.Y.S.2d 584 (1997), the New York Court of Appeals considered the application of the "no prejudice" rule in the context of excess insurers and held that, unlike reinsurers, excess insurers are covered by the traditional "no prejudice" rule. The Court found that the "rights and obligations of excess insurers are more analogous to those of primary insurers than to those of reinsurers," and that "that the <u>Unigard</u> rule is inapplicable to providers of excess liability insurance." <u>Id.</u>, 90 N.Y.2d at 437, 684 N.E.2d at 15, 661 N.Y.S.2d at 585. The Court stated that:

> Apart from the fact that their coverage does not immediately attach after an occurrence but rather attaches only after the primary coverage for the occurrence is exhausted, excess insurers have most of the rights and obligations of primary insurers. They have the right to investigate claims and to

> participate in settlement negotiations, and they have even been held to be entitled to make their own settlement determinations. Critically, excess policies do not contain the "follow the fortunes" clauses that typify reinsurance contracts and leave reinsurers "little room to dispute the reinsured's conduct of the case."

Id., 90 N.Y.2d at 443, 684 N.E.2d at 18, 661 N.Y.S.2d at 588 (quoting Unigard, 79 N.Y.2d at 583, 594 N.E.2d at 574, 584 N.Y.S.2d at 293) (internal citations omitted).

### 2. The Crew Claims Procedure

Weeks Marine presents a number of reasons why the Crew Claims Procedure should be analyzed under the Unigard standard (i.e. that the American Club should be required to show prejudice). First, Weeks Marine contends that because of the provision in the Crew Claims Procedure stating that Weeks Marine "shall be responsible for the investigation, settlement, defense or appeal of any claim made or suit brought, or proceeding instituted against [Weeks Marine]. . .[,]" it is uniquely placed in a position analogous to the reinsurers in Unigard. Second, Weeks Marine notes that the American Club is not a liability insurer, but rather an indemnity insurer, again placing it in a similar situation to the reinsurers in Unigard. Third, Weeks Marine states that, unlike a typical primary liability insurance contract, the Crew Claims Procedure contemplates reporting some claims after a judgment. And

14

fourth, Weeks Marine emphasizes that, under the terms of the Certificate of Entry, it is responsible for both the first $1 million and any amount in excess of $3 million; thus, under the terms of the contract, the American Club only provides a "narrow layer of coverage." Pl.'s Mem. at 12.

While we recognize that there are elements of the Certificate of Entry that provide Weeks Marine with certain responsibilities that often belong to primary insurers, we find that these elements do not provide a basis upon which to depart from New York's traditional "no prejudice" rule.

As a preliminary matter, there can be no dispute that the American Club is not a reinsurer and the Certificate of Entry between Weeks Marine and the American Club is not a reinsurance contract. First, as noted above, "a certificate of reinsurance is a contract between two insurance companies." Unigard, 79 N.Y.2d at 582, 594 N.E.2d at 574, 584 N.Y.S.2d at 293. Here, only one insurance company is a party to the Certificate of Entry. Second, in a reinsurance contract, "the reinsured company agrees to cede part of its risk to the reinsurer in return for a percentage of the premium." Id. Here, there is no "reinsured company," and the premium at issue is simply that which Weeks Marine (the insured) paid to the American Club (the insurer) in return for the American Club's coverage. Third, "a reinsurance contract operates solely between the reinsurer and

the ceding company." _Id._   Here, the Certificate of Entry operates solely between the insured and the insurer.   And fourth, a reinsurance contract "confers no rights on the insured. . . ."   _Id._   Here, the essence of Weeks Marine's argument is that the Certificate of Entry confers significant rights upon it.

Nevertheless, Weeks Marine contends that the reporting requirements in the Crew Claims Procedure make it "analogous to the reporting requirements in reinsurance contracts," and thus that the American Club should be required to show prejudice. Pl. Mem. at 11.   We disagree.   Even if we assume that it is appropriate to consider whether provisions of a primary insurance contract can effectively convert the contract into a reinsurance contract for purposes of determining the applicability of New York's "no prejudice" rule, we do not find that the Unigard rule applies in this case.   Unlike in many reinsurance contracts, the Certificate of Entry does not include a "follows the fortune" clause, which the New York Court of Appeals in American Home found to be a critical difference between excess insurance contracts and reinsurance contracts. American Home, 90 N.Y.2d at 443, 684 N.E.2d at 18, 661 N.Y.S.2d at 588.   The American Home court noted that such clauses "typify reinsurance contracts and leave reinsurers little room to

dispute the reinsured's conduct of the case." Id. (internal quotation marks omitted).[3]

The lack of a "follows the fortune" clause in the contract between Weeks Marine and The American Club makes sense, as there may be a number of cases in which the interests of the insured and the insurer are, at a minimum, not "generally identical." Unigard, 79 N.Y.2d at 583. For example, a claim that Weeks Marine values at between $1 million and $3 million would have little impact on Weeks Marine (since it would be spending the entirety of its $1 million deductible), but a significant impact on the American Club. Indeed, under Weeks Marine's proposed interpretation of the Crew Claims Procedure, it could settle a claim against it for $3 million, and then notify the American Club and demand $2 million in indemnification. This would be inconsistent with "[t]he rationale of the no-prejudice rule," which the New York Court of Appeals has stated "is clearly applicable to a late notice of lawsuit under a liability insurance policy." Argo Corp. v. Greater New York Mut. Ins. Co., 4 N.Y.3d 332, 340, 794 N.Y.S.2d 704, 707, 827 N.E.2d 762, 756 (2005). "A liability insurer, which has a duty to indemnify and often also to defend, requires timely notice of lawsuit in order to be able to take an active, early role in the litigation

---

[3] In Unigard, the "follows the fortune" provision of the reinsurance contract stated, in relevant part, that "[a]ll claims covered by this reinsurance when settled by the Company shall be binding on the Reinsurers, who shall be bound to pay their proportion of such settlements." Unigard, 79 N.Y.2d at 583 n.2.

process and in any settlement discussions and to set adequate reserves." Id.

The absence of a "follows the fortune" clause in the Certificate of Entry relates to another meaningful distinction between the primary insurance contract at issue in this case and the reinsurance contract in Unigard. Here, even though the Certificate of Entry provided Weeks Marine with the responsibility to defend and investigate claims, it did not eliminate certain of the American Club's rights to control the handling of claims against its members. Specifically, the American Club's By-Laws provided the American Club with the ability to control or direct the conduct of a claim by a club Member. See By-Laws at 27-29. The American Club's rights with regard to the handling of claims are substantially more significant than the reinsurer's "right to associate" (i.e. "the right [of the reinsurer] to consult with and advise the reinsured in its handling of a claim" (Unigard, 79 N.Y.2d at 583, 594 N.E.2d at 575, 584 N.Y.S.2d at 294), which the Unigard court found insufficient to warrant application of the "no prejudice" rule in the reinsurance context. This is so for two related reasons: first, the right to control the handling of a claim is more meaningful than the right to provide advice with regard to a claim. Second, as stated above, here the interests of the insured (Weeks Marine) and the primary insurer (the

American Club) are not "generally identical," and thus the insurer's view on how to handle a particular claim is more likely to diverge from the view of the insured.

In sum, where there is no dispute that the Certificate of Entry is not a reinsurance contract, and where the American Club is not a reinsurer, and where the American Club's coverage only was triggered after Weeks Marine's $1 million retention was spent, and where the Certificate of Entry did not include a "follows the fortune" clause, we find it appropriate to apply New York's traditional "no prejudice" rule.  We thus turn to the question of whether, under the terms of the Crew Claims Procedure, Weeks Marine was required to report the Garza claim.

**C. Interpretation of the Crew Claims Procedure**

**1. Contract Interpretation Under New York law**

The threshold issue for a court in any contract dispute is to determine whether the language of a contract is unambiguous. In interpreting contractual agreements, the "fundamental objective" of the court "is to determine the intent of the contracting parties 'as derived from the language employed in the contract.'" Consolidated Edison, Inc. v. Northeast Utilities, 426 F.3d 524, 527 (2d Cir. 2005) (citing Abiele Contracting v. N.Y. City Sch. Constr. Auth., 91 N.Y.2d 1, 9, 666 N.Y.S.2d 970, 689 N.E.2d 864 (1997)).  "Where the contract is clear and unambiguous on its face, the courts must determine the

intent of the parties from within the four corners of the instrument." Id. (quoting Meccico, v. Meccico, 76 N.Y.2d 822, 824, 559 N.Y.S.2d 974, 559 N.E.2d 668 (1990)). However, where a contract is ambiguous, "extrinsic evidence may be considered 'to ascertain the correct and intended meaning of a term' or terms." Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 178-79 (2d Cir. 2004) (quoting Alexander & Alexander Services, Inc. v. These Certain Underwriters at Lloyd's, London, England, 136 F.3d 82, 86 (2d Cir. 1998)).

Further, "[a]scertaining whether or not a writing is ambiguous is a question of law for the trial court." Morse/Diesel, Inc. v. Trinity Industries, Inc., et al., 67 F.3d 435, 443 (2d Cir. 1993) (quoting Sayers v. Rochester Telephone Corp. Supplemental Mgmt. Pension Plan, 7 F.3d 1091, 1094 (2d Cir. 1993)). "Under New York law '[c]ontract language is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" Id. (quoting Sayers, 7 F.3d at 1095). However, if the words of the contract convey a definite and precise meaning where there is no reasonable basis for a difference in opinion, summary judgment may be granted. Seiden Associates, Inc. v. ANC Holdings, Inc.,

959 F.2d 425, 428 (2d Cir. 1992).  Arguments made by the parties that include differing meanings for a provision do not necessarily mean a provision is ambiguous.  Id.

### 2. Weeks Marine's Arguments

Weeks Marine presents a number of arguments as to why it was not required to report Garza's concussion.  First, Weeks Marine argues that the other injuries listed in paragraph (d) of the Crew Claims Procedure (in addition to a "brain or spinal cord injury")—namely, amputation of a major extremity, death, and second degree burns—"are each indicative of severe physical injuries of a lasting or permanent nature."  Pl.'s Mem. at 14. Thus, Weeks Marine contends that it "reasonably intended and interpreted '[b]rain or spinal cord injury' to relate to a physical injury to the brain, with serious permanent residual physical or mental impairment, and not a clinical diagnosis of an alteration of a claimant's mental state. . . ."  Id.  Second, Weeks Marine contends that the Certificate of Entry left the determination of whether a particular occurrence fell within the scope of the Crew Claims Procedure's reporting requirements up to Weeks Marine's Risk Management department; and since Weeks Marine did not view Garza's concussion as a brain injury, it did not violate the contract's reporting requirement.  Id. at 13-14. In support of this argument, Weeks Marine cites to the deposition of an underwriter from the American Club to argue

that the American Club itself "had no understanding of the phrase '[b]rain or spinal cord injury.'" Id. at 16.  And third, Weeks Marine argues that the phrase "brain or spinal cord injury" is ambiguous in the context of the Garza claim.  Id. at 18-21.  We find all three arguments unavailing.

### a. The other injuries in section (d)

Viewing the Crew Claims Procedure as a whole, it is evident that the parties specifically provided for the required reporting of certain "serious" injuries. For example, under section (c) of the Crew Claims Procedure, Weeks Marine is required to report "any occurrence which causes serious injury (disability for a period of nine months or more) to two or more employees." (emphasis added).  Furthermore, the descriptions of some of the injuries in section (d) include language that requires Weeks Marine to determine the severity of a kind of injury, as opposed to only determining whether a kind of injury occurred.  Thus, Weeks Marine was required to report cases involving the "[a]mputation of a major extremity" (as opposed to any extremity) and "[a]ny second or third degree burn of 50% of the body or more" (as opposed to a burn of any degree on any percentage of the body).[4]

_____

[4] Of course, no such determination of severity would be required with regard to cases involving death (the fourth injury listed in section (d)).

Weeks Marine's proposed interpretation of section (d) of the Crew Claims Procedure (i.e. that the phrase "brain or spinal cord injury" describes injuries involving "a physical injury to the brain, with serious permanent residual physical or mental impairment. . . .") effectively requires the addition of the word "serious" or "major" before "brain or spinal cord injury." Had the parties intended to only include "severe and lasting brain injur[ies]" (id. at 15) within the category of cases that required reporting, they could have done so.  The language of the Crew Claims Procedure reflects no such intent.  See, e.g., ReliaStar Life Ins. Co. of N.Y. v. EMC Nat'l Life Co., 564 F.3d 81, 88 (2d Cir. 2009) ("In interpreting a contract under New York law, words and phrases . . . should be given their plain meaning.") (ellipses in original and internal quotation marks omitted).

### b. Weeks Marine's Determination of Whether There was a Brain Injury

Weeks Marine's contention that it was solely responsible for the determination of whether a particular occurrence fell within the scope of the Crew Claims Procedure's reporting requirements (and thus that because it did not view Garza's concussion as a brain injury, it did not violate the reporting requirements) fails for a number of reasons.  First, unlike the provisions in the Crew Claims Procedure that required

notification when a claim "appears to involve indemnity by the American Club" (emphasis added), or when the reopening of a case "might involve liability to the American Club," (emphasis added), the provision addressing a "brain or spinal cord injury" lacks any such subjective component.

Second, and more significantly, even assuming that Weeks Marine did not view Garza's concussion as a "brain injury," Garza himself alleged that he has suffered a "brain injury." See Decl. of John M. Woods ("Woods Decl."), Ex. 5 ("Plaintiff, Maximino Garza, sustained severe and permanent injuries on or about February 15, 2006.  In addition to a closed head injury and brain injury as well as injuries to his body generally. . . ."). Thus, the Garza case was one "involving" a brain injury.

Third, to the extent that Weeks Marine argues that Garza was not diagnosed as having a "brain injury," that argument is not supported by the record.  While it is true that Garza underwent a CT-scan after the accident and was not diagnosed with any fractures, hemorrhages, or hematomas, the record shows that Garza was diagnosed as having suffered a "contused cranium with concussion." See id., Ex. 6 at 8.

Fourth, Garza's doctors testified during the underlying litigation that Garza had suffered a brain injury. See, e.g., id., Ex. 1 at 40:16-18 (deposition testimony of Fred Perez, Jr., M.D.) ("[Garza] suffered a concussion, or, in other words, he's

suffered a – what we call a closed head injury to the brain."); id., Ex. 2 at 21:23-25 (deposition testimony of Ralph B. Lilly, M.D.) ("[Garza] had a post-traumatic headache, meaning headaches seen after the actual trauma from the brain.").

Finally, Weeks Marine's reliance on the deposition testimony of an American Club underwriter, Stuart J. Todd, is unavailing. When asked at his deposition whether he has a "thought process" about the term "brain or spinal cord injury", Todd responded: "[b]rain or spinal cord injury." Decl. of John A.V. Nicoletti in Opp'n to the Defs.' Mot. for Summ. J. ("Nicoletti Decl."), Ex. 1 at 79:12-15. When asked whether he was offering a "[p]lain reading," Todd responded "[p]lain reading." Id. at 79:16-17. While Todd stated that he did "not have a definition for brain," he testified that his view was that the term "brain injury" speaks for itself. Id. at 79:25-80:8.

In light of this record, Weeks Marine must rely on an argument that, in the context of the Crew Claims Procedure, the phrase "brain injury" is ambiguous, and a concussion is not a brain injury.[5] We consider that argument below.

_____

[5] While defendants have only relied in their papers on the "brain or spinal cord injury" provision of the Crew Claims Procedure, we note that plaintiff was also required to provide prompt notice of "[a]ny occurrence, claim, award or proceeding judgment which exceeds 50% of the Insured's retention policy." Defs.' 56.1 at ¶ 9 (Crew Claims Procedure section (b)). As noted above (supra p. 5), Garza made a pre-trial settlement offer of $850,000. Under a plain reading of the terms of the Crew Claims Procedure, the settlement offer

### c. Is a Concussion a Brain Injury?

Weeks Marine contends that it was not required to report the Garza claim to the American Club because Garza's injury-a concussion-is not a brain injury.  <u>See</u> Pl.'s Mem. at 19.  In support, Weeks Marine cites to an excerpt from the University of Pittsburgh's <u>Brain Trauma Research Center</u> on sports-related concussions.  The excerpted passage states that "physicians and sports medicine researchers do not even agree on the definition of 'concussion.'  Previous attempts to objectify the diagnosis of concussion or post-concussive syndrome using multiple concussion scales, computed tomography (CT), magnetic resonance imaging (MRI), and EEG have been unsuccessful."[6]

Aside from the fact that this article is published by a "<u>Brain Trauma</u> Research Center," and that the above-quoted passage discusses attempts to objectify the diagnosis of a concussion, the next paragraph in the article states that "most experts" believe that the symptoms of concussions are related to metabolic dysfunction in the inferior parietal, prefrontal, and cingulate cortex [i.e. parts of the brain]." <u>Id.</u>  The article further states that the symptoms "<u>occurring after TBI</u> [traumatic brain injury] have been implicated as <u>the cause for this</u>

---

of $850,000 was a claim in excess of 50% of the insured's retention (<u>i.e.</u> in excess of $500,000), and thus should have been reported.

[6] University of Pittsburgh, Department of Neurological Surgery, Brain Trauma Research Center, Sports-Related Concussion: Background and Significance, http://www.neurosurgery.pitt.edu/trauma/concussion.html (last visited Aug. 17, 2011).

<u>dysfunction</u>.   <u>Id.</u>   (emphasis added).   Indeed, the article notes that "[i]t has also been postulated that metabolic dysregulation, until fully resolved, <u>may make the brain more vulnerable to a second injury</u>, thus explaining the severe neurological dysfunction or death when a second impact occurs before these abnormalities resolve."   <u>Id.</u>   If the brain is vulnerable to a "second injury," after metabolic dysregulation, presumably it was injured a first time.

Although Weeks Marine cites to other publications in support of its contention that the definition of a concussion is ambiguous, none of these publications seriously question whether a concussion is an injury to the brain.   For example, Weeks Marine cites to the American Academy of Neurology, which states that a "[c]oncussion is a trauma-induced alteration in mental status that may or may not involve loss of consciousness."[7]   But the American Academy of Neurology's description of the symptoms of a concussion clearly states that those systems "may occur immediately after <u>the blow to the head</u> or several minutes later" and that "[r]epeated concussions can cause <u>cumulative brain injury</u> in an individual injured over months or years . . . ."   <u>Id</u>. (emphasis added).

---

[7] American Academy of Neurology, Practice Parameter, Management of Concussion in Sports, http://www.aan.com/professionals/practice/guidelines/pda/concussion_sports.pdf (last visited Aug. 17, 2011).

Whatever the symptoms of a concussion are, it is beyond dispute that they are caused by trauma, and that the trauma is to the brain.  <u>See, e.g.</u>, Mayo Clinic Staff, Definition of Concussion ("A concussion is a traumatic brain injury that alters the way your brain functions. . . . <u>[E]very concussion injures your brain to some extent</u>.") (emphasis added)[8]; Medic8, Discussion of Mild Head Injury (Concussion) ("Concussion, or mild traumatic brain injury (MTBI), is the most common and least serious type of traumatic brain injury. Concussion involves a transient loss of mental function. It can be caused by acceleration or deceleration forces, or by a direct blow.")[9]; American Associate of Neurological Surgeons, Discussion of Concussion ("A concussion is an injury to the brain that results in temporary loss of normal brain function.  It is usually caused by a blow to the head. . . . The formal medical definition of concussion is: a clinical syndrome characterized by immediate and transient alteration in brain function . . .")[10].  <u>See also</u> <u>Harmeyer v. Dohm</u>, No. 06-4220, 2007 WL 4294667, at *3 (E.D. La. Mar 7, 2007) (denying request to exclude evidence of a doctor's diagnosis of a "cerebral concussion, Grade I" where whether plaintiff suffered a brain injury was at

---

[8] http://www.mayoclinic.com/health/concussion/DS00320 (last visited Aug. 17, 2011).
[9] http://www.medic8.com/healthguide/articles/mildheadinjury.html (last visited Aug. 17, 2011).
[10] http://www.aans.org/Patient%20Information/Conditions%20and%20Treatments/Concussion.aspx (last visited Aug. 17, 2011).

issue); <u>Simone v. Astrue</u>, 08-CV-4884, 2009 WL 2992305, at *3 n.5 (E.D.N.Y. Sept. 16, 2009) (citing the Mayo Clinic and defining a concussion as "a mild traumatic brain injury, usually occurring after a blow to the head," and defining post-concussion syndrome as "a complex disorder in which concussion symptoms-such as headaches and dizziness-last for weeks and sometimes months after the impact that caused the concussion").

**D. Estoppel**

Weeks Marine argues that, even if it was required to provide notice of the Garza claim, there is a genuine issue of material fact as to whether the American Club is estopped from denying coverage for the claim as untimely. Pl.'s Mem. at 21-24. Specifically, Weeks Marine contends that the American Club had previously provided coverage for two claims that Weeks Marine reported years after it first became aware of the claims. Thus, Weeks Marine argues that it "relied upon the prior practice of the American Club's acceptance of claims under the Crew Claims Procedure provision after a judgment or on the eve of trial," and that, as a result, "the American Club should be estopped from denying the Garza claim because of untimely notice." <u>Id.</u> at 23.

"The purpose of equitable estoppel is to preclude a person from asserting a right when he or she has led another to form the reasonable belief that the right would not be asserted, and

loss or prejudice to the other would result if the right were asserted." Shondel J. v. Mark D., 7 N.Y.3d 320, 326 853 N.E.2d 610, 613, 820 N.Y.S.2d 199, 202 (2006); see also Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P., 7 N.Y.3d 96, 106-07, 817 N.Y.S. 2d 606, 612 (2006) (noting that "estoppel is imposed by law in the interest of fairness to prevent the enforcement of rights which would work fraud or injustice upon the person against whom enforcement is sought and who, in justifiable reliance upon the opposing party's words or conduct, has been misled into acting upon the belief that such enforcement would not be sought") (internal quotations and citation omitted).

Here, Weeks Marine's estoppel argument fails for two reasons. First, the American Club's By-Laws include an anti-waiver clause, which states that:

> No act, omission, course of dealing, forbearance, delay or indulgence by the [American Club] in enforcing any of these Rules or any contractual terms and conditions shall prejudice or affect the rights and remedies of the [American Club] under these Rules or under such contracts, and no such matter shall be treated as any evidence of waiver of the [American Club's] rights thereunder, nor shall any waiver of a breach by a Member of such Rules or contracts operate as a waiver of any subsequent breach thereof. The [American Club] shall at all times and without notice be entitled to insist on the strict application of these Rules and on the strict enforcement of its contracts.

By-Laws at 33.  This provision preserves the American Club's rights and defenses and bars the assertion of an estoppel claim in this case.  See Trident Int'l Ltd. v. American S.S. Owners Mut. Protection and Indemnity Ass'n, 05 Civ. 3947 (PAC), Order at 3-4 (S.D.N.Y. Feb. 4, 2009) (citing, inter alia, the American Club's anti-waiver provision and stating that "[p]ermitting the application of waiver and estoppel principles would make the terms of the Club Rules meaningless"); see also Fin. Techs. Intern., Inc. v. Smith, 247 F.Supp.2d 397, 407 (S.D.N.Y. 2002) ("Under New York law, where an agreement contains a no-waiver provision such as this one, a party's failure to insist upon strict compliance is not considered a waiver of his right to demand exact compliance.") (internal quotation marks omitted).

Second, both of the previous claims upon which Weeks Marine relies are distinguishable in significant ways.  As a preliminary matter, neither of the two previous claims involved a brain injury.  Furthermore, one of the claims (the Gregorio Vela claim) was reported to the American Club after plaintiff made a settlement demand above Weeks Marine's "Self Insured Retention level" (Nicoletti Decl., Ex. N), and was settled within Weeks Marine's deductible.  Thus, a claim was never made on the American Club.  Reply Mem. of Law in Support of American Steamship Owners Mutual Protection and Indemnity Ass'n, Inc. and Shipowners Claims Bureau, Inc.'s Mot. for Summ. J., at 5 n.3.

While the second claim (the Jose Salinas claim) was reported to the American Club after a verdict was issued, there is no indication (and plaintiff's do not allege) that this claim implicated any prompt notice provision in the Crew Claims Procedure.

In sum, where the American Club's By-Laws contain a no-waiver provision, and where the American Club's conduct concerning prior claims does not provide a basis upon which Weeks Marine could have reasonably believed that the American Club would not assert its rights with regard to the Garza claim, the American Club is not estopped from denying coverage for the claim as untimely.

## CONCLUSION

For the reasons sets forth above, the defendants' motion for summary judgment is granted.


New York, New York

August 24, 2011


NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

32

Copies of the foregoing Order have been mailed on this date to
the following:

Attorney for Plaintiff:
David R. Hornig, Esq.
Nicoletti Hornig & Sweeney
88 Pine Street
7th Floor
New York, NY 10005

Attorney for Defendants:
John M. Woods, Esq.
Clyde & Co. US LLP (NYC)
The Chrysler Building
405 Lexington Avenue
New York, NY 10174